# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

Michelle Bain on behalf of her minor child,
J.B., Melinda Bowes on behalf of her minor
child, L.B., Danielle Hagen, and Malcolm Lucas,

Case No.:

       Plaintiffs,

v.

JUUL Labs, Inc., and
Altria Group, Inc.

       Defendants.

---

# COMPLAINT

---

1.     Plaintiffs are young individuals, and guardians of those individuals, who began using Defendants' JUUL e-cigarette products ("JUUL Vaping Products") as a result of Defendants' pervasive false and deceptive marketing campaign targeted at young people. They are among the millions of youths who have been severely and negatively impacted by Defendants' campaign to promote and sell a highly addictive product as if it was safe, fun and appropriate for recreational use by young people when it is nothing of the kind.

2.     The JUUL Vaping Products that were sold to Plaintiffs and millions of other adolescents and young people are highly addictive, no safer than cigarettes, cause permanent injuries to adolescents and have been landing teens around the country and in Wisconsin in the hospital with severe respiratory illnesses.

3.     Defendants' improper marketing targeted adolescents like Plaintiffs and have wiped out the decades of progress that was achieved in preventing youth smoking after tobacco companies, including Defendant Altria (formerly Phillip Morris), targeted and addicted children

to nicotine during the latter half of the last century. Before Defendants' actions, there had been a substantial reduction in smoking in the United States that represented one of the most important public health advances of the last 50 years. Among children and adolescents this progress had been particularly significant, with youth smoking rates declining among 8th-, 10th-, and 12th-grade students from 28.3% in 1997 to 5.5% in 2015.[1]

4.      In 2015, however, Defendants launched a product and a false and deceptive marketing campaign that would flip over a decade of positive progress on its head in just a few short years. That product was the JUUL Vaping Product.

5.      Otherwise known as an electronic nicotine delivery system ("ENDS"), the JUUL Vaping Product consists of a sleek delivery device that resembles a flash drive (about the size of a pack of gum) and a "pod" filled with a flavored liquid containing a nicotine salt that is vaporized through the delivery device. Using this device has popularly become known as "vaping" or "JUULing."

6.      To tap into the void in the cigarette market left by the decades-long effort to reduce youth smoking, Defendants didn't look much farther than the play book "Big Tobacco" had used to addict adolescents decades before. Defendants infused their JUUL Vaping Product with flavors attractive to adolescents, including flavors like mango, crème brulee, mint and "fruit medley" and then delivered these flavors in sleek devices, that the company called "the i-phone of e-cigarettes." Defendants capitalized on the same themes "Big Tobacco" had used to appeal to youths decades before, including health, romance, sophistication and celebrity to market

---

[1] Koval R, Willett J, Briggs J. "Potential Benefits and Risks of High-Nicotine e-Cigarettes." *JAMA*. 2018;320(14):1429–1430. doi:10.1001/jama.2018.12328; Adolescents and Tobacco: Trends, U.S. Department of Health and Human Services, https://www.hhs.gov/ash/oah/adolescent-development/substance-use/drugs/tobacco/trends/index.html.

JUUL Vaping Products to adolescents. This time Defendants employed new media targeted at adolescents, namely social media, but the tactics were the same.

7.      The JUUL Vaping Products that Defendants portrayed as youthful, innocent and carefree are even more addictive than traditional cigarettes, cause permanent injuries to adolescents and have caused adolescents around the country, including in Wisconsin, to suffer both addiction to nicotine and severe health issues as a result of using JUUL Vaping Products.

8.      Despite knowledge that their products were in fact more dangerous to adolescents than cigarettes, Defendants promoted, and continue to promote, JUUL Vaping Products as "safer" than cigarettes, even going as far as to teach children in schools that the JUUL Vaping Products are "totally safe" and "99% safer than cigarettes."

9.      These claims, and many others made by Defendants to market and sell their JUUL Vaping Products, were false. Indeed, the nicotine in JUUL Vaping Products is even more potent than traditional cigarettes and JUUL's patented system allows a potent dose of nicotine to be absorbed into the body at a significantly higher rates than traditional cigarettes or other e-cigarettes using liquids. The amount of nicotine in one JUUL pod is at least equivalent to a pack of cigarettes. Since teens often use multiple pods in one sitting, they can unknowingly become exposed to unsafe levels of nicotine that can have immediate and long-term health consequences.  Additionally, the oils, flavors and other ingredients used in the JUUL Vaping Products can be toxic to the lungs of adolescents.

10.     Despite the serious risk of causing a renewed teenage epidemic of addiction to nicotine and all the serious health risks to adolescents JUUL Vaping Products cause, Defendants launched a pervasive and sophisticated marketing campaign aimed directly at the youth population.

11.     In upending decades of progress, Defendants callously pursued profit without regard for youth health and safety. Indeed, as one JUUL engineer put it, "We don't think a lot about addiction here because we are not trying to design a cessation product at all…anything about health is not on our mind." Defendants were simply trying to corner a market that had long been sought after since the years of Big Tobacco: attracting young customers and addicting them so they remained customers for life. Today, one of JUUL's founders, James Monsees admits that JUUL's teen marketing campaign was "flawed."[2]

12.     JUUL's "flawed" and unquestionably dangerous marketing campaign was also wildly profitable. In 2017 alone, sales of JUUL grew 700% and by 2018, JUUL had garnered 72% of the e-cigarette market share. With the JUUL marketing scheme, the e-cigarette market ballooned from approximately $2.75 billion in 2014 to over $7 Billion in 2016.  By 2018, JUUL was reportedly valued at $38 billion. Indeed, on December 20, 2018, Altria (the tobacco giant formerly named Phillip Morris) cashed in on JUUL's success, purchasing 35% of JUUL for $12.8 billion.

13.     Sales to young people drove this meteoric growth. Defendants marketing went viral and teenagers like Plaintiffs flocked to the JUUL Vaping Product as Defendants had planned, bringing cigarette use among adolescents back to levels not seen since the early 2000s:

---

[2] https://www.cnbc.com/2018/08/03/juul-e-cigarettes-popularity-among-teens-concerns-schools-fda.html



**Teen vaping is surging**

Trends in use of cigarettes and vape devices in the past 30 days among 12th-graders

Source: "National Adolescent Drug Trends in 2018," NEJM

*Vox*

14.    As the U.S. Surgeon General recently observed, "Today, more high school students use e-cigarettes than regular cigarettes. The use of e-cigarettes is higher among high school students than adults."[3] In just one year, from 2017 to 2018, high school students' use of e-cigarettes increased 78% (from 11.7% to 20.8%). Among middle school students, usage increased 48% during that time period (from 3.3% to 4.9%). In 2018, over 3.6 million youths used e-cigarettes.[4] The Secretary of the U.S. Department of Health and Human Services, Alex

---

[3] https://e-cigarettes.surgeongeneral.gov/ (as of August 29, 2019).
[4] https://www.fda.gov/tobacco-products/youth-and-tobacco/youth-tobacco-use-results-national-youth-tobacco-survey (as of August 29, 2019)

5

Azar, recently stated: "We have never seen use of any substance by America's young people rise as rapidly as e-cigarette use is rising."

15. By 2018, both the federal Food and Drug Administration ("FDA") Commissioner and the United States Surgeon General were calling underage e-cigarette usage "an epidemic."

16. The teens, including Plaintiffs, who purchased and used the JUUL Vaping Products, were unaware of the risks of the JUUL Vaping Products and are now suffering the severe consequences of Defendants' false and deceptive marketing, including addiction, increased health risks, health consequences and economic losses.

17. Plaintiffs' lawsuit seeks recovery for the serious and permanent injuries Defendants' JUUL Vaping Products have caused, for their economic losses as a result of Defendants' conduct, and for injunctive relief to stop Defendants' conduct in the future.

## PARTIES

**A.    Plaintiffs**

18. Plaintiff, Michelle Bain, resides in Kenosha, Wisconsin. Plaintiff is the parent of minor J.B.

19. Plaintiff J.B. was a resident and citizen of Kenosha, Wisconsin.

20. Plaintiff J.B. was 16 when he began using JUUL Vaping Products.

21. Plaintiff J.B. began using JUUL Vaping Products after seeing Defendants' advertisements on various social media accounts, as well as seeing his high school aged friends using JUUL products.

22. Despite never using e-cigarettes or combustible cigarettes with any regularity before using a JUUL e-cigarette, Plaintiff J.B. developed a nicotine addiction after beginning to use JUUL Vaping Products. Indeed, he was unable to quit using the products.

23.     JUUL's e-cigarettes caused Plaintiff J.B. damage both financially and to his health, including mood swings, irritability, and addiction, caused by his use of JUUL's e-cigarettes.

24.     Ultimately, and tragically, Plaintiff J.B. passed away on June 29, 2019.

25.     The advertising Plaintiff J.B. saw did nothing to warn him of the serious health consequences and addiction he could suffer as a result of using JUUL Vaping Products.

26.     Had Plaintiff J.B. known the truth about the addictiveness and health risks to teenagers of JUUL Vaping Products, he would not have purchased or used the product.

27.     Plaintiff, Melinda Bowes, resides in Elkhorn, Wisconsin. Plaintiff is the parent of minor L.B.

28.     Plaintiff L.B. is a resident and citizen of Elkhorn, Wisconsin.

29.     Plaintiff L.B. was 13 when she began using JUUL Vaping Products.

30.     Plaintiff L.B. began using JUUL Vaping Products after seeing Defendants' advertisements on Facebook and Snapchat, as well as seeing her high school aged friends using the products.

31.     Despite never using e-cigarettes or combustible cigarettes with any regularity before using a JUUL e-cigarette, Plaintiff L.B. developed a nicotine addiction after beginning to use JUUL Vaping Products. Indeed, she has been unable to quit.

32.     JUUL's e-cigarettes caused Plaintiff L.B. damage both financially and to her health, including difficulty breathing, sore throat, headaches, and addiction, caused by her use of JUUL's e-cigarettes.

33.     The advertising Plaintiff L.B. saw did nothing to warn her of the serious health consequences and addiction she could suffer as a result of using JUUL Vaping Products.

34.    Had Plaintiff L.B. known the truth about the addictiveness and health risks to teenagers of JUUL Vaping Products, she would not have purchased or used the product.

35.    Plaintiff Malcolm Lucas is and was at all relevant times a citizen and resident of Milwaukee, Wisconsin.

36.    Plaintiff Lucas was 15 when he began using JUUL Vaping Products.

37.    Plaintiff Lucas began using JUUL Vaping Products after being exposed to advertisements on Instagram, Facebook, and Snapchat, as well as seeing his high school age friends using JUUL products.

38.    Prior to using JUUL Vaping Products, Plaintiff Lucas had not used tobacco products with any regularity. After beginning JUUL Vaping Products, Plaintiff Lucas is now addicted to nicotine.  Indeed, he is unable to quit using the products.

39.    Plaintiff Lucas has suffered health consequences as a result of using JUUL Vaping Products including persistent breathing issues and addiction, that he did not experience prior to using JUUL Vaping Products.

40.    The advertising Plaintiff Lucas saw did nothing to warn him of the serious health consequences and addiction he could suffer as a result of using JUUL Vaping Products.

41.    Had Plaintiff Lucas known the truth about the addictiveness and health risks to teenagers of JUUL Vaping Products, he would not have purchased the product.

42.    Plaintiff Danielle Rose Hagen is and was at all relevant times a citizen and resident of Cumberland, Wisconsin.

43.    Plaintiff Hagen was 20 when she began using JUUL Vaping Products.

44.    Plaintiff Hagen began using JUUL Vaping Products after being exposed to advertisements on Instagram and Facebook, as well as seeing her friends using JUUL products.

8

45.     Prior to using JUUL Vaping Products, Plaintiff Hagen had not used tobacco products with any regularity. After beginning JUUL Vaping Products, Plaintiff Hagen is now addicted to nicotine.  Indeed, she is unable to quit using the products.

46.     Plaintiff Hagen has suffered health consequences as a result of using JUUL Vaping Products including shortness of breath, persistent lung issues, and addiction, that she did not experience prior to using JUUL Vaping Products.

47.     The advertising Plaintiff Hagen saw did nothing to warn her of the serious health consequences and addiction she could suffer as a result of using JUUL Vaping Products.

48.     Had Plaintiff Hagen known the truth about the addictiveness and health risks to teenagers of JUUL Vaping Products, she would not have purchased the product.

**B.     Defendants**

49.      Defendant JUUL Labs, Inc. ("JUUL") is, and at all times relevant was, a Delaware corporation with its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc. and a new company was created as the PAX Labs, Inc. referenced below. A substantial portion of the conduct cited here occurred while JUUL was operating as PAX Labs, Inc.

50.     Defendant Altria Group Inc. ("Altria") is a Virginia corporation, having its principal place of business in Richmond, Virginia.

51.     Altria owns the Marlboro cigarette brand and Philip Morris USA, the largest cigarette company in the U.S.[5]

52.     On December 20, 2018, Altria purchased a 35% stake in JUUL in exchange for $12.8 billion. (JUUL and Altria will collectively be referred to as "Defendants" herein).

---

[5] http://investor.altria.com/Cache/396883765.pdf, p.2.

53.     Defendants manufacture, design, sell, market, promote and distribute JUUL Vaping Products, including through sales at physical retail locations across the United States and internet sales through websites maintained by Defendants.

54.     PAX Labs, Inc. ("PAX") is a Delaware corporation, having its principle place of business in San Francisco, California.

## JURISDICTION AND VENUE

55.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of costs and interest.

56.     This Court has personal jurisdiction over Defendants because Defendants are licensed to and authorized to conduct business in the State of Wisconsin, have engaged in substantial and continuous business activity in the State, and have committed tortious activities within the State of Wisconsin, including where Plaintiffs are located. Defendants either reside, are found, or have an agent or transact their affairs in this District.

57.     Defendants' contacts with this District and the United States as a whole satisfy the "minimum contacts" test, such that the exercise of jurisdiction over them is consistent with constitutional due process protections.

58.     Venue in this District is appropriate under 28 U.S.C. § 1391 because Defendants are subject to the personal jurisdiction of this Court with respect to this action, Defendants conduct substantial business in this District, and because a substantial part of the events or omissions giving rise to this action occurred in this District.

10

# FACTUAL ALLEGATIONS

### A. The Dangers of the JUUL Vaping Products' Ingredients Have Long Been Known

59.     The JUUL Vaping Products contain ingredients that have long been known to cause serious health risks.

60.     The first of the harmful components of JUUL Vaping Products is nicotine.

61.     The real and serious health risks of nicotine have been well known for decades. Since at least the 1980s, numerous reports of the United States Surgeon General have concluded that cigarettes and tobacco products are addicting and that "Nicotine is the drug in tobacco that causes addiction."[6] Nicotine has the potential to adversely affect the lungs, the heart, the kidneys, reproductive systems, have negative cognitive and behavioral effects, and cause an increased risk of stroke.

62.     The dangers of exposing an adolescent's brain to nicotine are significant and have been well known for decades. In adolescents, nicotine has been shown to affect brain development, attention, cognition, and raises the risk of becoming addicted to other drugs. The adolescent brain is more vulnerable to the effects of nicotine than the adult brain and using nicotine causes immediate and permanent changes to the adolescent brain.

63.     The JUUL Vaping Products contain a higher nicotine content and a more concentrated mechanism of nicotine delivery than traditional cigarettes. Far from being the "safer" alternative to cigarettes, JUUL Vaping Products actually cause increased exposure to the dangers of nicotine than traditional cigarettes. According to the Surgeon General, "e-cigarettes use poses a significant – and avoidable – health risk to young people in the United States.

---

[6] *The Health Consequences of Smoking—50 Years of Progress: A Report of the Surgeon General*; National Center for Chronic Disease Prevention and Health Promotion (US) Office on Smoking and Health. Atlanta (GA): Centers for Disease Control and Prevention (US); 2014.

Besides increasing the possibility of addiction and long-term harm to brain development and respiratory health, e-cigarette use is associated with the use of other tobacco products that can do even more damage to the body. Even breathing e-cigarette aerosol that someone else has exhaled poses potential health risks." The serious health risks that exposure to nicotine causes in adolescents are as follows:

    a.  Addiction (both to nicotine and increased risk of priming the adolescent brain for addition to other drugs);

    b.  Mood disorders;

    c.  Permanent lowering of impulse control;

    d.  Harm to parts of the brain that control attention and learning; and

    e.  Respiratory illness.

64.    Not only do Defendants' JUUL Vaping Products deliver this potent and dangerous drug, but it does so in higher concentrations and in a nicotine salt formulation which is absorbed into the body at a significantly higher rate than traditional combustible cigarettes or other e-cigarettes.

65.    The amount of nicotine in one JUUL pod is at least equivalent to a pack of cigarettes. Since teens often use multiple pods in one sitting, they can unknowingly become exposed to unsafe levels of nicotine that can have immediate and long-term health consequences.

66.    Additionally, Defendants' JUUL Vaping Products add an extra element of danger not found in traditional cigarette products in that its design exposes its user to inhaling the oil-based substances in JUUL's patented pod solution.

67.    Inhaling oil-based substances has long been known to cause significant respiratory issues and permanent injuries to the lungs and respiratory systems.

12

68. Defendants failed to disclose that their JUUL Vaping Products were associated with any of these health effects, and instead promoted them as particularly "safe," healthy, and a carefree, youthful recreational product.

**B. Despite the Known Risk to Adolescents, Defendants Design a Product Aimed at the Youth Population**

69. JUUL Labs, Inc. and PAX Labs, Inc. began as Ploom, Inc. in 2007. Adam Bowen and James Monsees, the founders of JUUL, first invented the Ploom, a cigarette-shaped device into which a capsule filled with ground tobacco that was vaporized at lower-than-combustion temperatures using an electrical heating element.

70. The Ploom design drew only modest revenues, mostly because their product closely resembled traditional cigarettes.

71. JUUL (formerly PAX) knew that to corner the youth market, they needed a new design and a new approach. In 2014, Bowen, Monsees and others submitted a patent application for the JUUL Vaping Product, a self-regulating vaporization device and cartridge.

72. The JUUL Vaping Product had two basic parts. The first part was the delivery device having a battery, a charger and a pressure sensor which activates the heating system when air is drawn across it when a smoker inhales. The second part is a pod which contains JUUL's patented liquid made up of nicotine salt, glycerol and propylene glycol, benzoic acid and flavorants. The liquid in the JUUL pod is heated creating a vapor which is inhaled by the user, thus leading to the term "vaping." Combined, the JUUL Vaping Product resembles a flash drive, something that high school students might routinely carry with them. The JUUL Vaping Product fits in the palm of your hand, making it easy to conceal, and therefore attractive to teens. Furthermore, unlike cigarette smoke, the byproduct "vaping" has no real odor and is a virtually undetectable aerosol.

13

73.     In addition to an appealing and concealable physical design, JUUL developed a new way of delivering nicotine, by mixing nicotine with a chemical called benzoic acid. The result is a quicker and stronger delivery of nicotine, which more closely resembles a traditional cigarette but delivers concentrations in significantly higher amounts. One study found that an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine). JUUL's nicotine concentration has been found to be 60 mg/ml, and JUUL's salt form increases the rate and efficiency of nicotine delivery. JUUL Vaping Products therefore substantially exceed the nicotine dose of a traditional cigarette.

74.     Additionally, studies have shown that Defendants have underrepresented both the benzoic acid solution in its JUUL Vaping Products as well as the nicotine concentration; Defendants represent that each JUUL pod contains 5% or 50 mg/m, when in reality a single JUUL pod contains 6% nicotine or 60 mg/mL of nicotine per JUUL pod. Similarly, JUUL represents that its JUUL Vaping Products contains a 4% benzoic acid solution, but its products have been found to have a greater benzoic acid solution of 4.5%.

75.     Further, JUUL's patented solution contained in the pod portion of its product contain oil-based components and flavoring elements which, when inhaled, can cause severe respiratory issues and illness.

76.     All of these components make JUUL's product extremely dangerous to youth and to make any marketing to youth as safe for youth consumption, per se improper, false and deceptive.

Case 2:20-cv-01697   Filed 11/11/20   Page 14 of 42   Document 1

## C.     Defendants Market a Product to Youth

77.     Despite the grave dangers, Defendants proceeded to target the youth from the start of its pervasive marketing campaign in 2015. They did this because they knew that, by addicting children to vaping products, Defendants would have customers for life. Indeed, to quote Massachusetts Attorney General Maura Healey: "This is about getting kids to start vaping, and make money and have them as customers for life."

78.     Defendants "got kids to start" through a pervasive and professional marketing campaign developed in conjunction with professional media firms Cult Collective LP ("Cult Collective") and Grit Creative, LLC ("Grit"), whose stated objective is to is to "give brands a cult-like following." Defendants and their creative firms pulled out all the stops to create a cult-like following through their marketing campaign nicknamed "Vaporized," including splashy, colorful ads depicting flirtatiously posed young people holding JUULs, hosting launch parties in big cities such as New York, Miami and Los Angeles where products were featured and free products distributed, and employing social media "influencers" and celebrities to prominently use JUUL's products and more to inspire teens to purchase their product.

### The Youth Advertising Campaign

79.     Defendants employed an advertising campaign that portrayed JUUL Vaping Products as safe and carefree without any mention of risk and allowed customers to purchase JUUL Vaping Products with a click of a button on the internet:

Case 2:20-cv-01697   Filed 11/11/20   Page 15 of 42   Document 1



80.　　In telling fashion, JUUL chose to launch their advertising campaign through a single magazine, VICE magazine, a "glossy pop culture focused publication which markets itself to advertisers as '*#1 youth media company*.'"[8]

81.　　The campaign featured initial product launch parties in large cities around the United States featuring young and hip models advertising the launch:

---

[7] http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf, p. 8.
[8] http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf, p. 17.



82. It featured young people in backpacks attending those parties, advertising the young, hip thing to do was to use JUUL Vaping Products:



83.     Defendants employed young, good looking sales representatives to attend these

events and distribute free products and merchandise:



84.     Sample distribution even exceeded the goals of the marketers, often exceeding

thousands of samples distributed at a single event:



**THE RESULTS:**
On average, BeCore exceeded the sampling goals set by JUUL for each location (average number of samples/event distributed equals 5,000+).

85.     Ads that falsely portrayed JUUL as the "safer alternative to cigarettes" were splashed across social media:



86.     Active young models using JUUL Vaping Products in a series of playful poses were prominently displayed on billboards in Times Square in New York City:



87.     Many of these advertising techniques came straight out of the playbook of "Big Tobacco" and mirrored techniques that "Big Tobacco" had earlier used for decades to hook youth on cigarettes. In fact, researchers at Stanford who examined Defendants' advertising drew some startling parallels between Defendants' advertising and that of "Big Tobacco" decades ago. Some examples they utilized are illustrative of the similarities:

20















**Marketing Techniques Used to Drive Youth Sales**

88.     Not only did Defendants design an advertising campaign that resonated with young customers, but they directly targeted the youth population through the media they used to market the JUUL Vaping Products, including heavily marketing through social media to target young customers.

89.     JUUL Vaping Products were heavily promoted on social media, including Facebook, Twitter and Instagram. Defendants created hashtags like "#JUUL," "#JUULvapor," "#switchtoJUUL," "#vapelife," and "#vaporized," to ensure a viral style peer to peer promotion and to target youth in the media they use every day.

90.     Defendants pumped Twitter, Facebook and Instagram with the advertising campaign described above, promoting widespread use of their product, spreading the word about their launch parties and events and giving kids easy access to their products, which, until 2019 could be purchased through JUUL's website without restriction, and currently contains only limited restrictions.

91.     Through social media, Defendants were able to make sure content designed to influence youth use, including images of celebrities using JUUL Vaping Products, went viral and reached a wide audience of young people through the media they use daily.

92.     Through social media, JUUL was able to advertise without even using its own ads.  For example, after celebrity Katy Perry was photographed at the Golden Globes holding a JUUL Vaping Product, JUUL posted this photo on its Twitter and Facebook accounts to spread the message that celebrities who teens admired were using the product and they should too:

23



93.     Defendants didn't just wait to catch a celebrity using the product to promote its products across social media. Defendants employed social media "influencers," people with wide social media followings to generate content that could be spread through social media endorsing the product as if these "influencers" were independent customers who simply loved the product. "Influencers" were paid to promote JUUL Vaping Products through their social media following, with compensation typically determined by how many followers they have or are able to generate. Those "influencers" would then recommend JUUL Vaping Products or put photos of them in carefree and fun situations seemingly enjoying JUUL Vaping Products.

94.     JUUL not only used these "influencers," but hired employees in their marketing departments whose job it was to "create and manage blogger, social media and celebrity influencer engagements. . . to build and nurture appropriate relationships with key influencers in order to drive positive commentary and recommendations through word of mouth and social

media channels, etc."[9] Marketing interns were paid to develop and manage these relationships and ensure that content marketing JUUL Vaping Products was spread across social media:



95.     Additionally, JUUL used an undisclosed "affiliate program," to market its product and drive traffic to its website. That program makes payouts to online sites which refer business to Defendants. In the vaping industry, this most often takes the form of sites which review the product favorably and include a link to the product's website, especially to their "buy now" section.

96.     In their affiliation application, JUUL explained "How it works:"

How it works: You get paid by advertising performance campaigns to your audience on your blog, website, newsletter, search landing page.  Depending on

---

[9] http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf at 19; citing JUUL Influencer Marketing Intern. https://www.internships.com/marketing/influencer-marketing-interni739175.

the specific terms of our agreement you can get paid as frequently as daily using direct deposit into your bank account.

\*\*\*

The purpose of this Agreement is to allow HTML linking between your web site and the juulvapor.com website.

97.     Even though JUUL was paying these "affiliates," it instructed them that they needed to represent they were impartial, instructing affiliates that: "[a]t all times, you must clearly represent yourself and your web sites as independent from juulvapor.com."

98.     JUUL did not wait for internet admirers to apply to become an affiliate because they happened to like the product. Rather it recruited "affiliates" over Twitter and social media and through JUUL's website, advertising the opportunity for anyone who has an existing web presence to "make more money" simply by reviewing "high quality products" (and then promoting their web traffic to JUUL's website):



99.     All of the aspects of this pervasive marketing campaign were designed to get young people smoking again (this time with a vaping product). Indeed, a recent study published by researchers at Stanford University who examined Defendants' three-year marketing campaign

for JUUL Vaping Products found that: "The generational focus of JUUL's advertising has clearly been upon Gen Y young adults and Gen Z school age youth" and that JUUL's marketing was "patently youth-oriented."[10]

100.    Former CDC Director Dr. Tom Frieden observed that, "The same advertising tactics the tobacco industry used years ago to get kids addicted to nicotine are now being used to entire a new generation of young people to use e-cigarettes."[11]

101.    Perhaps most egregious, is that Defendants also made false and misleading statements directly to children in schools that JUUL Vaping Products were perfectly safe, including telling them the following:[12]

    a.  That JUUL "was much safer than cigarettes" and that "FDA would approve it any day."[13]
    b.  That JUUL was "totally safe."[14]
    c.  That a student "…should mention JUUL to his [nicotine-addicted] friend…because that's a safer alternative than smoking cigarettes, and it would be better for the kid to use."[15]
    d.  That the "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes…and that…would happen very soon…."[16]

102.    All of this was false and simply designed to improperly expand JUUL's market to include the lucrative youth market.

---

[10] http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf
[11] https://www.cdc.gov/media/releases/2016/p0105-e-cigarettes.html
[12] FDA Warning Letter to JUUL Labs, Inc. dated September 9, 2019, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019
[13] Hearing, July 24, 2019, Testimony of Ms. Meredith Berkman , at 52:27 – 53:31 (https://youtu.be/m3iEMrAd83o)
[14] Hearing, July 24, 2019, Testimony of Mr. Caleb Mintz , at 1:18:50 – 1:19:11 (https://youtu.be/m3iEMrAd83o)
[15] Hearing, July 24, 2019, Testimony of Mr. Phillip Fuhrman , at 1:20:20 – 1:21:14 (https://youtu.be/m3iEMrAd83o)
[16] Hearing, July 24, 2019, Testimony of Mr. Phillip Fuhrman, at 1:21:45 – 1:22:02 (https://youtu.be/m3iEMrAd83o)

### E. Defendants Cause a "Meteoric" Rise in E-Cigarette Use Among Adolescents and Resulting Injuries

103.    JUUL's advertising campaign did exactly what it was designed to do: start adolescents smoking e-cigarettes in droves.

104.    Indeed, from 2016 to 2017, JUUL Vaping Products' sales increased over 640%, rising from over 2 million in 2016 to devices sold to over 16 million devices sold in 2017. JUUL Vaping Products now hold the largest market share of any e-cigarette product, cornering approximately 75.8% of the e-cigarette market as of 2018.

105.    Consequently, high school students' use of e-cigarettes increased 78% from 2017 to 2018 (from 11.7% to 20.8%). Among *middle school* students, usage increased 48% during that time period (from 3.3% to 4.9%). That amounts to an increase of over 1.5 million students using e-cigarettes in 2018 over those who used them in 2017. By 2018, over 3.6 million youth used e-cigarettes.[17]

106.    Those teenagers saw Defendants' marketing. Indeed, the Surgeon General's Advisory on E-Cigarette Use Among Youth found that JUUL's twitter account was being followed by adolescents and the 25% of those retweeting official JUUL tweets were under 18. The National Youth Tobacco Survey found that 78.2% of middle and high school students- 20.5 million youth- have been exposed to e-cigarette advertisements.

107.    Plaintiffs were among the youths who saw and were exposed to Defendants' social media advertising regarding JUUL Vaping Products and who purchased those products as a result.

---

[17] https://www.fda.gov/tobacco-products/youth-and-tobacco/youth-tobacco-use-results-national-youth-tobacco-survey (*accessed* August 29, 2019).

108.    As a result of their pervasive exposure to Defendants' advertising campaign, teenagers are far more likely to be JUUL users than JUUL's supposed target demographic of 25- to 34-year-olds.[18] In fact, "15- to 17-year-olds have over 16 times greater odds of being current JUUL users compared with those between 25 and 34 years old."[19]

109.    Both the FDA Commissioner and the United States Surgeon General have called underage e-cigarette usage "an epidemic."

110.    On September 9, 2019 the FDA warned JUUL about its false marketing practices and its marketing practices to the youth population, stating that its concerns over JUUL's marketing practices were amplified by "the epidemic rate of increase in youth use of ENDS products, including JUUL's products, and evidence that ENDS products contribute to youth use of, and addiction to, nicotine, to which youth are especially vulnerable."[20]

111.    Often, these minors do not know or understand what they are inhaling when they use a JUUL e-cigarette. In fact, more than half of the millions of high school students who are JUUL customers believe they were only inhaling the JUUL flavoring, not nicotine:[21]

---

[18] Truth Initiative, The Youth E-Cigarette Epidemic: 5 Important Things to Know, https://truthinitiative.org/news/youth-e-cigarette-epidemic-5-important-things-to-know
[19] https://truthinitiative.org/research-resources/emerging-tobacco-products/teens-are-16-times-more-likely-use-juul-older-age
[20] FDA Warning Letter to JUUL Labs, Inc. dated September 9, 2019, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019
[21] https://psychnews.psychiatryonline.org/doi/full/10.1176/appi.pn.2018.1b2



**WHAT TEENS ARE INHALING**

When students were asked what they thought was in the e-vaporizer mist they inhaled the last time they smoked, these were their responses:

112.    The fact that JUUL Vaping Products contain more nicotine than cigarettes, deliver a more concentrated product and put its underage users at risk of serious and permanent health issues is never disclosed to the youths who JUUL is marketing to and who buy JUUL's products.

113.    In fact, until August of 2018, Defendants had no warning that the JUUL Vaping Product even contained nicotine. Finally, when public scrutiny was too much and when the FDA, CDC and other federal agencies began to get involved, JUUL added a brief disclosure that still fails to advise adolescents of the sever risks to adolescents, including that JUUL Vaping products contain a potent dose of nicotine, that the nicotine doses delivered by JUUL products are several times higher than cigarettes, that the JUUL products are more addictive than cigarettes, that the products and are particularly addictive to adolescents, and that the ingredients in JUUL Vaping Products put adolescents at serious risks of cancer, stroke, respiratory illness, and permanent effects on the adolescent brain.

114.    Without this knowledge, adolescents, including Plaintiffs, bought JUUL Vaping Products and became quickly addicted to nicotine. They have suffered negative health consequences and have been exposed to a product to which adolescents never should have been exposed.

**F.  When Caught, JUUL Denies its Conduct and Destroys Evidence**

115.    By 2018, Defendants began to be the subject of scrutiny by the United States government over its improper marketing practices to the youth population and its false and misleading marketing statements.

116.    On September 12, 2018, the FDA sent letters to e-cigarette manufacturers, including JUUL and Altria, to put them "on notice by the FDA of how their products were being used by youth at disturbing rates."

117.    On November 15, 2018, the CDC revealed that e-cigarette use in general increased 78% among high school students and 48% among middle school students just from 2017-2018.

118.    The United States Congress also launched an investigation and called JUUL executives to testify before Congress in July of 2018.

119.    On September 9, 2019, the FDA issued a strong warning to JUUL regarding its marketing to teens and its false claims in marketing.

120.    After being caught trying to turn teens into e-cigarette customers, JUUL now claims that its e-cigarettes are only for adult use and that adults were always its target audience. Its advertising alone belies the truth of this claim.

121.    JUUL also destroyed or tried to destroy evidence of its early marketing. Indeed, when researchers from Stanford went to assemble JUUL's adverting and social media marketing,

they discovered that "JUUL has deleted a large portion of its social media history." Those researchers also found that:

> [T]he entire inventory of JUUL communications from its initial marketing campaign "Vaporized" have been expunged by the company. "Vaporized" would have remained vaporized had we not been able to resurrect this campaign from other sources. Instagram postings prior to June 17, 2017 were entirely deleted prior to mid-2018 and then a second deletion occurred in August 2018 leaving only new postings on the switch theme.

122.    After deleting evidence of their youth marketing campaign, Defendants have shifted to pretending like they were marketing to adults all along. Defendants use of older models in advertising and a message of "switching" to JUULs is very recent and appeared only after Defendants came under investigation for selling to youth.

123.    Yet, Defendants still claim (falsely) that its products are "less risky" and "safer," have done nothing to re-educate the millions of youth smokers they addicted since its launch in 2015, and have never retracted their marketing messages to this youth population.

124.    Instead, Defendants left millions of teenagers and young adults in the United States, including Plaintiffs, to suffer from serious health consequences and from addiction.

## CAUSES OF ACTION

### First Cause of Action-
### Strict Product Liability, Failure to Warn (Wis. Stat. Ann. § 895.047)

125.    Plaintiffs incorporates by reference the preceding paragraphs.

126.    Defendants' JUUL Vaping Products present a substantial risk of harm to its users, minors, and the general public. This is true whether the Defendants' products are used in the intended fashion or in a reasonably foreseeable misuse.

32

127.    Defendants' JUUL Vaping Products were defective and unreasonably dangerous when they left Defendants' possession. The defects continued to exist through the products' sale to and use by consumers, including Plaintiffs.

128.    Defendants were aware that their JUUL Vaping Products had potential risks to users that were both known and knowable in light of the information and knowledge available to Defendants.

129.    Nonetheless, Defendants failed to adequately warn and/or instruct foreseeable users of its products of the risks its JUUL Vaping Products carried. In fact, Defendants did the opposite, marketing their JUUL Vaping Products to minors, omitting necessary information about their products, misrepresenting the nicotine levels and concentration, omitting important information about the other contents of their products, and misrepresenting the health risks of the products.

130.    Plaintiffs did not and would not have recognized the potential risks of using the Defendants' products. Nor would any ordinary consumer of Defendants' JUUL Vaping Products. This is not only because Defendants failed to warn of these risks, but because Defendants intentionally downplayed and intentionally misrepresented the risks its products posed.

131.    Plaintiffs were harmed by Defendants' failure to warn, in an amount to be determined at trial.

**Second Cause of Action-**
**Strict Product Liability, Design Defect (Wis. Stat. Ann. § 895.047)**

132.    Plaintiffs incorporate by reference the preceding paragraphs.

133.    Defendants developed, manufactured, marketed, distributed, and sold their JUUL Vaping Products intending they be used as a method to ingest nicotine and their other components.

33

134.     Defendants' JUUL Vaping Products were defective and unreasonably dangerous when they left Defendants' possession. The defects continued to exist through the products' sale to and use by consumers, including Plaintiffs.

135.     Defendants knew that the consumers could not inspect the contents or test the contents of Defendants' products prior to their use. Defendants knew or should have known that their JUUL Vaping Products, under ordinary and foreseeable use, were harmful to users, particularly minors.

136.     For all of the reasons alleged above, Defendants' JUUL Vaping Products contained and continues to contain a manufacturing defect, was and is defective in design, and was and is defective because of inadequate instructions or warnings. Defendants' products do not perform safely, as a reasonable and ordinary consumer would reasonably assume and reasonably expect. The JUUL Vaping Products contain and deliver more nicotine than is represented and more nicotine than is reasonable or necessary. The products are likely to, and indeed designed to, cause nicotine addictions. The JUUL Vaping Products are designed to, and do, induce minors to purchase and use them.

137.     Further, Defendants' JUUL Vaping Products cannot perform safely for adolescents when used in a foreseeable manner, including both as intended and in a foreseeable misuse of the JUUL Vaping Products.

138.     These risks outweigh any benefits of Defendants' Vaping Products, which are nonexistent to adolescents, especially considering the gravity of the potential harm resulting from the JUUL Vaping Products use by adolescents, the likelihood of harm occurring from the JUUL Vaping Products' use, the cost and feasibility of an alternative design at the time of manufacture, and any disadvantages of an alternative design.

34

139.     Reasonable alternative designs exist which would reduce the risk of harm to Plaintiffs and all consumers of Defendants' JUUL Vaping Products, such as lowering the nicotine levels, content, and efficiency; not marketing to minors; not designing the product to be appealing to minors; and not using flavors designed to entice minors.

140.     Defendants' decision to utilize the designs they did caused Plaintiffs injury and renders Defendants' products not reasonably safe.

141.     Plaintiffs were unaware of the design defects in Defendants' products.

142.     As a result of Defendants' defective design, Plaintiffs have been injured in an amount to be determined at trial.

**Third Cause of Action-
Violation of Wis. Stat. § 100.18**

143.     Plaintiffs incorporates by reference the preceding paragraphs.

144.     Plaintiffs are a member of the public within the meaning of Wis. Stat. § 100.18.

145.     The Wisconsin Deceptive Trade Practices Act ("WDTPA") makes unlawful any "representation or statement of fact which is untrue, deceptive, or misleading," in the course of Wis. Stat. § 100.18(1).

146.     As discussed above, Defendants entire marketing campaign that was aimed at youth smokers was deceptive. That campaign portrayed the JUUL Vaping Product as safe for young people to use and that it could be used safely without health consequence. Quite the opposite, Defendants advertising and marketing campaign was targeted at youth and portrayed health, energy and sophistication without warning of the terrible and real risks to youth of using the JUUL Vaping Products.

147.     Defendants routinely misrepresented the nature of their products and engaged in false, misleading, unfair, and deceptive acts and practices, including but not limited to the following:

      a.   Portraying and marketing JUUL Vaping Products as safe for youth consumption;

      b.   Misrepresenting or falsely downplaying the risks of JUUL products to adolescents;

      c.   Misrepresenting that JUUL Vaping Products were "safer" than cigarettes;

      d.   Misrepresenting the health benefits of switching from cigarettes to JUUL Vaping products;

      e.   Misrepresenting the nicotine and benzoic acid concentrations in their JUUL Vaping Products;

148.     These false, misleading, unfair, and deceptive acts and practices were intentional and knowing.

149.     These false, misleading, unfair and deceptive acts caused direct and proximate injury to Plaintiffs.

150.     Defendants' violations of the WDTPA are on-going. These violations present a continuing harm to Plaintiffs as well as the general public.

151.     Plaintiffs have been injured by Defendants' WDTPA violations in an amount to be determined at trial.

**Fourth Cause of Action-**
**Fraud (Intentional Misrepresentation)**

152.     Plaintiffs incorporate by reference the preceding paragraphs.

153.     Defendants sold, or partnered to sell, their products to Plaintiffs as non-addictive, or at least less addictive nicotine products than cigarettes, when Defendants knew that was false.

36

154.     Defendants further failed to disclose to Plaintiffs that their products were highly addictive, failed to disclose they were designed to create an addiction to nicotine, and failed to disclose that they were otherwise harmful to users, including Plaintiffs.

155.     These misrepresentations and omissions were and are material to Plaintiffs, and to Plaintiffs' decision to purchase and use Defendants' products. Plaintiffs in fact relied upon Defendants' statements about their products, including not just the labeling on Defendants' products but Defendants' advertising described herein, when Plaintiffs decided to obtain and use Defendants' products.

156.     Defendants had a duty to accurately provide this information to Plaintiffs, and to not withhold this material information from Plaintiffs. Defendants' failure to adhere to this duty was a breach, that financially benefited Defendants.

157.     This fraud upon Plaintiffs caused Plaintiffs harm, including exposure to toxic chemicals, addiction, other negative health impacts, and economic harms, injuring Plaintiffs in an amount to be determined at trial.

**Fifth Cause of Action-
Negligence**

158.     Plaintiffs incorporate by reference the preceding paragraphs.

159.     At all relevant times, Defendants owed Plaintiffs a duty to, among other things,

    a.     Exercise reasonable care in how their products were marketed and advertised;

    b.     Exercise reasonable care to ensure their products were not sold or distributed to minors, including but not limited to employing procedures and processes to ensure Defendants and their agents do not sell or distribute Defendants' products to minors;

    c.     Exercise reasonable care to ensure that their advertising and marketing were not designed in a way to entice minors to purchase and or use the products;

    d.     Exercise reasonable care to ensure that their advertising and marketing were not designed in a way to make their products unduly attractive to minors;

37

e.	Take reasonable steps to prevent minors from purchasing, obtaining, and or using their products when they knew or should have known that minors were in fact purchasing, obtaining, and or using their products;

f.	Advertise, market, and label their products accurately and provide sufficient and accurate warnings about the dangers of their products; and

g.	Not create a foreseeable risk of harm to minors.

160.	Defendants' conduct described herein was in direct breach of those duties.

161.	Through Defendants' conduct, and the breaches of their duties to Plaintiffs, Plaintiffs were harmed in at least the manner described herein. Defendants' conduct was and is the proximate cause of Plaintiffs' damage and injuries.

162.	Defendants' breach of its duties was reckless, and the harm caused easily foreseeable.

163.	As a result of Defendants' wrongful acts and omissions, Plaintiffs will also continue to suffer harm and damages in the future.

**Sixth Cause of Action-
Breach of Implied Warranty**

164.	Plaintiffs incorporate by reference the preceding paragraphs.

165.	The implied warranty of merchantability is included with each sale of Defendants' products.  Defendants warrant that the JUUL e-cigarette and pods are merchantable, fit for the ordinary purpose for which they are to be used, pass without objection in their trade, be of fair and average quality, and conform to Defendants' representations about the products. This implied warranty is part of the benefit of the bargain between Defendants and Plaintiffs. *See* Wis. Stat. § 402.314.

166.	Defendants breached this implied warranty. As discussed herein, Defendants' products posed serious safety risks, would not pass without objection, are not fit for the ordinary

38

purpose for which they are to be used, are not of fair and average quality, and do not conform to Defendants' representations about them.

167. Defendants received notice of their breach of warranty, within a reasonable time after the defects manifested themselves to Plaintiffs by virtue of its knowledge of the defects.

168. Defendants knew or, in the exercise of reasonable care, should have known that its products posed safety risks to Plaintiffs, and were defective prior to Plaintiffs' possession and use of the products.

169. Defendants breached those warranties as described above and herein, causing Plaintiffs harm in an amount to be determined at trial.

**Seventh Cause of Action-
Breach of Express Warranty**

170. Plaintiffs incorporates by reference the preceding paragraphs.

171. Defendants' representations about their products, including the misrepresentations described above and herein, became a basis of the bargain. The terms of the agreement include the promises, affirmations of fact, and representations made by Defendants regarding their products, including both the product packaging and through marketing and advertising of the products.

172. Defendants' products, as described herein, do not conform with Defendants' representations.

173. Plaintiffs have sufficient privity with Defendants through Plaintiffs' purchase of Defendants' products, as the retailers through whom Plaintiffs purchased the Defendants' products were Defendants' agents for that purpose.

174.     In the alternative, no privity is required because Plaintiffs are intended third party beneficiaries of the agreement between Defendants and the retailers through whom Plaintiffs purchased the products.

175.     Had Plaintiffs known the true nature of Defendants' products, Plaintiffs would not have used those products, would not have purchased those products, and would not have paid the amount Plaintiffs paid for those products.

176.     Defendants breached those warranties as described above and herein, causing Plaintiffs harm in an amount to be determined at trial.

**Eighth Cause of Action-**
**Unjust Enrichment**

177.     Plaintiffs incorporate by reference the preceding paragraphs.

178.     As a result of their acts and omissions described herein, Defendants obtained monies that rightfully belonged to customers under the age of 18, including Plaintiffs.

179.     Defendants accepted, retained, and appreciated the non-gratuitous benefits conferred by Plaintiffs and other underage minors who, without knowledge of Defendants' bad acts and omissions, purchased Defendants JUUL Vaping Products that they would not have otherwise purchased.

180.     Plaintiffs, alternatively, paid more for the JUUL products than Plaintiffs would have, had Plaintiffs known of the Defendants' bad acts and omissions.

181.     Defendants' unjust enrichment can be traced to, and resulted from, the conduct alleged herein.

182.     Defendants' retention of these wrongly-acquired monies and profits is and would be inequitable.

183.    Therefore, Plaintiffs seek restitution and disgorgement from Defendants, at an amount to be determined at trial.

**Ninth Cause of Action-
Strict Responsibility Misrepresentation**

184.    Plaintiffs incorporate by reference the preceding paragraphs.

185.    As alleged above, Defendants' conduct and representations, including their omissions, renders them liable as they made representations of fact that were untrue that Defendants knew or should have known these representations to be untrue. Defendants made these misrepresentations for the purpose of increasing sales, increasing users of their products, increasing the number of people addicted to their products, and ultimately increasing the value of and profit of their companies.

186.    Plaintiffs relied upon and believed the completeness and honesty of Defendants' representations about their products. Without these misrepresentations, Plaintiffs would not have purchased or used Defendants' products.

187.    Because of this, Plaintiffs have been harmed at an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court enter an Order:

   a.   Finding Defendants' conduct was negligent, deceptive, unfair, and unlawful as described herein;

   b.   Enjoining Defendants from engaging in negligent, unfair, inequitable, deceptive, and unlawful advertising as described herein;

   c.   Awarding Plaintiffs their actual, compensatory, and consequential damages;

   d.   Awarding Plaintiffs their statutory damages and penalties as allowed by law;

e. Awarding Plaintiffs punitive damages as allowed by law;

f. Awarding Plaintiffs restitution;

g. Awarding Plaintiffs their reasonable attorneys' fees, costs, and expenses; and

h. Granting such further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: November 11, 2020

*s/Erin K. Dickinson* _
**CRUEGER DICKINSON LLC**
Charles J. Crueger
Erin K. Dickinson
Benjamin Kaplan
4532 North Oakland Avenue
Milwaukee, WI 53211
Telephone: (414) 210-3868
*cjc@cruegerdickinson.com*
*ekd@cruegerdickinson.com*
*bak@cruegerdickinson.com*

Edward A. Wallace
**WEXLER WALLACE LLP**
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
*eaw@wexlerwallace.com*

Greg F. Coleman
**GREG COLEMAN LAW**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
*greg@gregcolemanlaw.com*

*Attorneys for Plaintiffs*

42